224 So.2d 191 (1969)
Acgie A. DESHOTEL et al., Plaintiff-Appellant,
v.
SOUTHERN FARM BUREAU CASUALTY INSURANCE CO., and Traders and General Insurance Company, Defendants-Appellees-Appellants.
No. 2711.
Court of Appeal of Louisiana, Third Circuit.
June 12, 1969.
Rehearing Denied July 7, 1969.
*192 Garrett, Ryland & Downs, by Donald M. Garrett, Alexandria, and Fusilier, Pucheu & Soileau, by L. O. Fusilier, Ville Platte, for plaintiff-appellant.
Watson, Brittain & Murchison, by Jack O. Brittain, Natchitoches, Gold, Hall & Skye, by John F. Simon, Alexandria, for defendant-appellee.
Before TATE, SAVOY and MILLER, JJ.
MILLER, Judge.
Mr. and Mrs. Acgie A. Deshotel seek damages for personal injuries sustained by Mr. Deshotel and medical expenses paid by Mr. Deshotel resulting from a collision which occurred at a controlled intersection. Both were guest passengers in their own car driven by their 17 year old son, Ronald Deshotel, in a caravan procession. Their *193 car was struck on the left side by the front end of a vehicle driven into the intersection by Mr. Rodney Parker after the light turned green for him. Insurers of both motor vehicles were made defendants.
The trial judge concluded that the sole proximate cause of the accident was the negligence of Ronald Deshotel; that this negligence was imputed to both his mother and father; that his mother committed independent contributory negligence which was a proximate cause of the accident; and that liability of Deshotel's insurer, Southern Farm Bureau Casualty Insurance Company, under its medical payments provision was $558.25, the amount tendered by that company. Parker's liability insurer is Traders and General Insurance Company. All parties have appealed.
Plaintiffs contend that the accident resulted from the concurrent negligence of both drivers, while the insurer of each driver contends that the accident was caused by the negligence of the other driver.
Questions presented are: Do vehicles in a procession have the right-of-way at a controlled intersection even though confronted with a red light? If not, are guest passenger parents negligent for failing to instruct the driver, their minor son, that a caravan procession cannot proceed through a red light?
The accident occurred about 5:30 p. m., March 5, 1965 at the intersection of Fenner and Mason Streets in the City of Alexandria. Mason Street is a paved, one-way street for south bound traffic, and Fenner Street is a paved, two-way street for traffic to proceed both east and west. Traffic is controlled by an electric semaphore traffic signal located above the center of the intersection.
Young Deshotel was driving his parents' 1965 Pontiac east on Fenner Street in a caravan of about 60 to 80 cars of supporters of the Pine Prairie High School girls' basketball team. The caravan was on its way to the Louisiana Sweet Sixteen Girls' Basketball tournament being held at that time in Pineville, Louisiana, and was being led by a State Policeman from Ville Platte, in a Louisiana State Police patrol car. Deshotel's car was positioned in the middle of the caravan. It is not clear that Deshotel did or did not have his headlights turned on, but the evidence is convincing that both the car ahead and the car behind had their headlights on. All cars had been decorated with streamers on the radio antennaes, and with signs approximately 12 inches by 12 inches placed either on the side or back of each car. However, most of the streamers and some of the signs had blown off before the accident occurred. Deshotel's vehicle was proceeding only one or two car lengths behind the car ahead of him. As Deshotel approached the intersection, the signal indicated yellow to the car ahead and turned to red before Deshotel reached the intersection. Deshotel did not slow from his approximate 30 mile per hour speed until he saw Parker enter the intersection. He then applied his brakes and the side of the left front fender of the Deshotel Pontiac was struck by the front of Parker's Buick.
Rodney A. Parker stopped his Buick automobile at the intersection facing south on one-way Mason Street. He was in the left hand lane alongside or abreast of a car in the right hand lane. As Parker had approached the intersection the light turned from green to red. While waiting approximately 15 seconds for the light to change, Parker's sole concern was with the traffic signal. Although the light did not turn amber for southbound traffic, Parker watched from the side to see it turn amber for west bound traffic, and the instant the light turned green he proceeded into the intersection without first looking to see if there was other traffic. Neither did he check to see if the vehicle on his right proceeded into the intersection. When Parker first looked to the right he saw the Pontiac only four or five feet *194 away and the accident occurred. Parker watched only the traffic signal so that he could move forward the instant it changed from amber for west bound traffic to green for southbound traffic. The impact occurred in the southeast quadrant of the intersection.
We agree with the trial court's finding that young Deshotel was negligent. The ordinance relied on by plaintiffs to give the caravan the right-of-way at this intersection is as follows:
"Sec. 26-56. Driving through procession.
"It shall be unlawful for any person except the driver of an authorized emergency vehicle to drive a motor or other vehicle through a procession unless by permission of a police or traffic officer. This provision shall not apply at intersections where traffic is controlled by police officers."
"Sec. 26-57. Driving in processions.
Each driver in a funeral or other procession shall drive as near to the right hand edge of the roadway as practical and shall follow the vehicle ahead as closely as is practical and safe."
Section 26-67 of this same ordinance provides essentially that all traffic must stop for a red light. We find that the above cited ordinance does not grant the driver in a procession the right to disregard traffic signals. Section 26-56 sets forth the rules regarding processions except where the procession is traveling through controlled intersections. Section 26-67 overrides Section 26-56. To hold otherwise would be to conclude that the ordinance allowed for mass confusion.
To the argument that the right-of-way of a procession can be established by custom, we note that no pertinent law has been cited to support that assertion. Funeral processions, and sometimes other types of processions, often usurp the right-of-way, and most persons stop for such processions out of respect or when instructed by officers posted at the intersections. This cannot be reasonably held to establish such a right-of-way for a spontaneous procession unsanctioned by local authorities and composed of 60 to 80 cars led by a Louisiana State Police unit from another area. We do not find that the Alexandria ordinance authorized groups to form caravans to indiscriminately drive through stop lights and other traffic signs, without providing police protection where traffic signals and signs are to be disregarded. We affirm the trial court's finding that young Deshotel was negligent for failing to slow for the amber light and stop for the red light which he observed.
We find manifest error in the trial court's decision that Parker was free from negligence. Applicable here is the rule that the favored motorist at an intersection controlled by a semaphore signal, may indulge in the assumption that other motorists will observe and obey the light until such time as he sees or should see that the driver with the unfavorable light has not observed or is not going to observe his right-of-way. If the motorist who has the favorable traffic light sees or should see that the other driver is going to violate his right-of-way, and thereafter the favored driver has a reasonable opportunity to avoid the accident and fails to do so, then the negligence of the latter in failing to take evasive action when he had an opportunity to do so is a proximate cause of the accident. Denton v. Fontenot, La. App. 3rd Cir. 1968, 216 So.2d 310; Smith v. Borchers, 1962, 243 La. 746, 146 So.2d 793; Vico Insurance Co. v. New Orleans Public Service, Inc., La.App. 4th Cir. 1965, 177 So.2d 425; McDaniel v. Grain Dealers Mutual Insurance Co., La.App. 1st Cir. 1966, 182 So.2d 561; Martin v. Slocum, La. App. 2nd Cir. 1962, 147 So.2d 454.
Parker admitted that he knew traffic was heavy, but thought it was typical of *195 the 5:00 o'clock traffic pattern. He testified that he knew that a caravan procession had the right-of-way, and had he known there was a caravan proceeding through he would have waited.
We conclude that under the circumstances presented here, Parker was negligent in concentrating his sole attention on the traffic signal and in proceeding into the intersection the very instant the signal changed to green without first looking to his right. Had Parker waited a moment and looked to the right, he would have seen that the Deshotel vehicle was committed to passing through the intersection and that other vehicles behind had their headlights on. All Parker had to do was hold his position, as was apparently done by the driver of the vehicle on Parker's right.
We distinguish the case of Winfield v. Louisiana Underwrit. of Amer. Indem. Co., La.App. 1st Cir. 1967, 203 So.2d 857, and La Hitte v. Acme Refrigeration Supplies, Inc., La.App. 4th Cir. 1966, 192 So.2d 172, on the facts. In Winfield, another vehicle approaching the crossing street had stopped for the unfavorable light before the favored vehicle started into the intersection. The accident occurred when the offending vehicle entered the intersection with an unfavorable light and after the leading vehicle had stopped for the light. Here, Parker knew that one vehicle went through the light while it showed amber. He knew that traffic was heavy. Yet he moved into the intersection the instant the light changed to green without looking to his right. In La Hitte, the party with the green light was on the left of another vehicle just as in the case before us. But there, both vehicles with the favored light started into the intersection at the same time. Here there was no suggestion that the vehicle on the right moved forward as Parker moved forward.
We fail to find independent contributory negligence by plaintiff Mrs. Deshotel. She and her husband were riding in the rear seat, with Mrs. Deshotel on the right side. In her opinion, her son was a better driver than she. While she admitted that she did not give him instructions as to how to drive in a caravan procession, this was not negligence which proximately caused this accident. There is nothing in the evidence to suggest improper driving by young Deshotel before this accident occurred. When the caravan proceeded through Oakdale earlier that day, officers had been posted at traffic signals and had waived the caravan through red lights.
The rule for independent contributory negligence of a guest passenger is set forth in White v. State Farm Mutual Auto Insurance Company, 1953, 222 La. 994, 64 So. 2d 245, 42 A.L.R.2d 338. After a thorough analysis of the jurisprudence, it was concluded that a guest is under no duty to supervise the driving of the vehicle and is not obliged to look out for sudden or unexpected dangers that may arise. Neither is he required to monitor the operation of the car or to pay attention to the road and other traffic conditions in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle. This accident occurred before Mrs. Deshotel saw red light.
On the issue of imputed negligence, plaintiff-appellant conceded that the claim for the Parker vehicle and she did not see the medical expenses by Mr. Acgie A. Deshotel, father of Ronald Deshotel, against Traders & General Insurance Company (insurer of Parker), is barred should it be found that Ronald Deshotel was negligent.
Negligence by Mrs. Deshotel's son is not imputed to her and doesn't bar her recovery for her damages. This was specifically held by the Louisiana Supreme Court in the case of Gaspard v. LeMaire, 1963, 245 La. 239, 158 So.2d 149. There the mother was a guest passenger in a vehicle involved in an accident which resulted from the joint negligence of her son and the operator of another vehicle. It was held that a mother is not responsible for damages occasioned by the negligence of her *196 minor children residing at home while the father is alive. Under LSA-C.C. Article 2318 that responsibility attaches only to the father.
On the issue of quantum we find this a most difficult case to appraise. Unquestionably the accident of March 5, 1965 was minor. Of the four occupants of the Deshotel vehicle, everyone got out of the car after the accident and only Mrs. Deshotel was injured. She was taken to the emergency room of Cabrini Hospital and her injuries were limited to a puncture type wound to the shin bone area of the right leg and a slight bruise on the left arm. X-ray studies were negative. Blood pressure was normal. She was given a tetanus injection and the puncture wound was bandaged and she was able to walk out of the emergency room. Dr. Bruce Wallace of Alexandria treated her in the emergency room and did not anticipate any complications. She returned to her home and next sought medical attention on March 13th, 1965.
Mrs. Deshotel then went to see Dr. Ramson Vidrine of Ville Platte, who treated plaintiff for the first time on that day. Both Dr. Vidrine and Mrs. Deshotel testified that she went to him four or five days after the accident, but Dr. Vidrine is certain that he didn't see her before March 13th when he placed her in the hospital. Mrs. Deshotel was described as "an extremely obess, flabby woman," and this made diagnosis of her condition extremely difficult.
Dr. Vidrine treated Mrs. Deshotel until March of 1967, and testified by deposition taken July 7, 1967. His examination of March 13th, 1965 revealed an area of swelling on the right leg with a place of excoriation. She had a hematoma on the leg and there was evidence of phlebitis of the leg. There was no pus draining but the area was swollen and red and inflamed. Her temperature was apparently normal. She was hospitalized until March 23rd in Ville Platte, then in Lafayette on March 24th and 25th for specific studies, hereinafter discussed, then returned to the Ville Platte hospital for March 26th and 27th. During this period and in the following months, Dr. Vidrine found many problems, all related to the accident, but was unable to assign a diagnosis. Suspected were heart disease, never confirmed as a specific problem, pulmonary embolus and gall bladder disease never confirmed, and kidney trouble which was confirmed, but not related to the accident. The doctors were unable to explain the epigastric pain which Mrs. Deshotel suffered before she went to the hospital, according to testimony in her deposition taken March 17, 1966 (Tr. 234), and about one week after she went to the hospital according to Dr. Vidrine's testimony, (Tr. 61).
Dr. Jacobs testified as plaintiff's witness. He admitted plaintiff to Lafayette General Hospital on March 24th at the request of Dr. Vidrine and solely for the purpose of running requested x-ray studies, thinking that Mrs. Deshotel might have a hiatus hernia. Tests were also to be run for possible gall bladder trouble. On admission Mrs. Deshotel gave a history of injuring her leg in an accident three weeks before; that three days before (about March 22nd) she developed chest pain which she described as being like a ball in her chest. No tests were made relating to her heart, and all tests were inconclusive. About two months later Dr. Jacobs read two electrocardiograms taken of Mrs. Deshotel, which were mailed to Dr. Jacobs. When he read these electrocardiograms he did not connect them with the Mrs. Deshotel he had previously admitted for tests. In any event, the electrocardiograms did not reveal any specific heart disease.
Dr. Vidrine found, as did Dr. Chastant, that plaintiff suffered from periods of depression. Plaintiff told Dr. Vidrine that she had never had heart trouble before the accident, but her records at Dr. Savoy's Clinic in Mamou indicated that prior to 1965 she had every symptom about which she has complained since March 5, 1965. *197 After the 1965 accident she did not seek treatment in the Mamou Clinic.
The positive diagnosis given by Dr. Vidrine of thrombophlebitis was not found by any of the doctors to whom she was referred by Dr. Vidrine. Dr. Harold J. Jacobs and Dr. Harold Chastant, both specialists in internal medicine from Lafayette, found nothing wrong with Mrs. Deshotel's leg and were of the opinion that she did not have thrombophlebitis.
Dr. Robert Luke Bordelon, orthopaedic specialist of Opelousas, saw plaintiff one time and then on August 27, 1965. He did not find thrombophlebitis, but concluded that plaintiff's complaints of leg pain were probably due to a periostitis. He testified that he has seen this pain persist for some time, but had never seen this completely incapacitate a person. When asked to classify the pain he stated, "It's usually described more as a discomfort than a true pain." Treatment recommended would be nothing more than aspirin or some very mild analgesic or occasionally Darvon.
Mr. Deshotel sought to recover $2,376.69 in medical expenses. (Dr. Vidrine $733.00, Dr. Jacobs $75.00, Dr. Chastant $90.00, Dupre Hospital $766.65, Lafayette General $112.35, Lafayette Memorial $420.15, Ambulance $27.50, Drugs $142.04.) The trial judge allowed only $558.25 under the medical payments provision of Deshotel's insurance policy with Southern Farm Bureau, concluding that all other medical treatment was unrelated to injuries suffered by Mrs. Deshotel in the accident.
We find no merit in plaintiffs-appellants' argument that the contract of insurance between Deshotel and Southern Farm Bureau was not before the court; that, therefore, the Court could not award judgment on the medical payments provisions of the contract of insurance. Plaintiff specifically sued Southern Farm Bureau for medical expenses and while the primary claim was under LSA-C.C. Article 2315, the issue of medical expenses was specifically before the court and the insurance policy is in evidence.
We find that the trial court erred in allowing only $558.25 in medical expenses. The tort-feasor takes his victim as he finds him and is responsible for aggravation of pre-existing ailments or disabilities. Graves v. Traders and General Insurance Company, La.App. 1st Cir. 1967, 200 So.2d 67.
Here we have a 55-year old obese claimant who was extremely difficult to diagnose and treat and who has suffered substantial pain and incurred large medical expenses as a result of the relatively minor accident. Several years after the accident she is still suffering pain in the area where her leg was injured. There is no question but that she had several episodes of depression following the accident. Dr. Vidrine relates it to the accident and Dr. Chastant testified that it could be related to the accident. Her chest complaints which developed within two weeks of the accident were properly and thoroughly investigated. While no definitive diagnosis was made, we find that these thorough examinations were related to the accident. While Dr. Jacobs could not name a specific heart disease, he found some non-specific electrocardiographic findingsnot diagnostic of anything in particular, but definitely abnormal.
We agree that it was proper for the trial judge to refuse to allow some of the medical expenses, for the evidence makes it clear that some of her treatment was for a kidney ailment not related to the accident. A fair assessment of the medical expenses related to the accident totals $1,672.35, (Dr. Vidrine $600, Dr. Jacobs $60, Dr. Chastant $90, Dupre Hospital & Clinic $600, Lafayette General Hospital $112.35, Ambulance $10, Drugs $200.) subject to a credit for the amounts previously paid or tendered on these bills. This amount is due to Mr. Acgie Deshotel under the medical payments provision of his insurance policy with Southern Farm Bureau.
*198 For pain, suffering and disability, Mrs. Deshotel is awarded $2,500. Although her injuries were relatively minor, she suffered many complications. We find that her ailments and disabilities which pre-existed the accident, were aggravated by the accident, and her obese condition made diagnosis and treatment extremely difficult.
For these reasons, Mr. Acgie Deshotel is awarded judgment against Southern Farm Bureau Casualty Insurance Company in the sum of $1,672.35, subject to credit for amounts previously paid, together with interest at the rate of 5% per annum from judicial demand, until paid.
Mrs. Acgie Deshotel is awarded judgment against both Southern Farm Bureau Casualty Insurance Company and Traders and General Insurance Company, in solido, in the amount of $2,500, together with 5% per annum interest from date of judicial demand, until paid.
All costs of court in the trial court and on appeal are to be paid by defendants.
Reversed and rendered.